1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TEIQUON LEWIS,

11              Petitioner,                    No. CIV S-05-1136 GEB EFB P

12         vs.

13   EVANS, Warden,

14              Respondent.                    FINDINGS & RECOMMENDATIONS

15   _____/

16       Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges his 1999 conviction in Solano

18   County Superior Court on four counts of robbery and one count of attempted robbery, with

19   findings of personal use of a deadly weapon, personal use of a firearm, infliction of great bodily

20   injury, two prior convictions and one prior prison term.  He also challenges his sentence of 150

21   years to life in prison imposed under California's Three Strikes Law.

22       Petitioner seeks relief on the grounds that: (1) his trial counsel rendered ineffective

23   assistance in failing to move to exclude evidence that was improperly seized, and in failing to

24   move for a new trial based on newly discovered evidence; (2) there was insufficient evidence to

25   support the firearm use enhancement; (3) he was subjected to an illegal search and seizure, in

26   violation of the Fourth Amendment; (4) the pretrial identification procedure was impermissibly

suggestive, in violation of his right to due process; and (5) his sentence constitutes cruel and unusual punishment.  Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

**I.      Procedural and Factual Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the First Appellate District provided the following factual summary:

**The Robbery of Audra Harvey (Count 1).**

Appellant was convicted of a series of robberies, the first of which occurred on December 16, 1998, at the Food 4 Less Supermarket in Vallejo.  The cashier, Audra Harvey, testified that at around 4:00 a.m. appellant approached the register with a loaf of bread. Before Harvey scanned the bread, appellant proclaimed "this is a robbery.  Open the drawer and give me the F-ing money."  While appellant held the bread in one hand, his other hand was tucked into his shirt, so Harvey thought he might have a gun.  After hesitating briefly, Harvey complied with appellant's demand and gave him about $125 from the cash register.  Appellant immediately left the store through the front door.

Once appellant was out of the store, Harvey contacted the police. Officer William Hamrick of the Vallejo Police Department responded to the robbery call within 10 minutes and took a statement from Harvey, who was "visibly upset" and shaken.  She described appellant as a "very large, heavyset male," approximately five feet ten inches tall, "250 plus" pounds, about 30 years old, wearing a "black knit cap."  Harvey testified that the robber had "a little bit of whiskers," a flat nose, and wore a "Pendleton type shirt," with a "beige" beanie.  The most distinctive feature of the man's face was his "cold, flat" eyes, which Harvey focused upon during the robbery.  Harvey selected appellant at a physical lineup on January 12, 1999, and positively identified him at trial.

**The Robbery of Richard Fuller (Count 2).**

Vallejo City Cab Company driver Richard Fuller was dispatched to 545 Georgia Street in Vallejo at 2:00 on the morning of December 25, 1998.  At that address, Fuller encountered a man he positively

_____

[1] Notice of Lodging Documents on January 18, 2006 (Dckt. No. 23), Resp.'s Lodg. Doc. H (hereinafter Opinion).

2

identified at trial as appellant, who lived in apartment number 2. Appellant got into the front seat of the cab, and directed Fuller to drive him to two stores, both of which were closed. Fuller drove to another location as directed by appellant, then "told him what the fare would be." Appellant "put something metal" against Fuller's neck, which Fuller thought was a knife or a gun. He warned Fuller, "Do as I say and nobody will get hurt." Fuller gave appellant money and the cab radio microphone as requested, whereupon appellant left the cab.

Fuller immediately reported the robbery to the police and provided a description of the suspect. Fuller described appellant to the police as a "Black male, approximately 25 years old, six-foot-four, over 300 pounds." Fuller recalled at trial that appellant had a "growth" of beard on his face, and a scar below his eye. Appellant wore a heavy gray and black parka over a gray and green Pendleton shirt, dark pants, and a "black stocking type cap." At the lineup on January 12, 1999, Fuller identified appellant, who was in position number three. Fuller testified, "I picked out the man that robbed me," not the largest man in the lineup.

**The Attempted Robbery of Michael Blackshire (Count 3).**

Vallejo City Cab Company driver Michael Blackshire was dispatched to 1006 Santa Clara Street in Vallejo on December 25, where two Black men were waiting for him, "one small, one large." At trial, Blackshire positively identified the large man, who was "300 plus" pounds and over six feet tall, as appellant. Appellant got in the front seat of the cab, while the smaller man sat in the rear. Just before they reached their destination, appellant put a gun to Blackshire's neck and demanded money. Blackshire responded, "okay, fine," but then changed his mind and "started wrestling for the gun" while the cab was stopped at an intersection. As the struggle for the gun progressed, Blackshire realized that "it was a toy gun," so he "started driving away" toward a lighted apartment complex ahead. The man in the rear seat jumped out of the cab.

As Blackshire drove down the hill, appellant "pulled a knife" and attempted to stab him in the side. Blackshire grabbed the knife and another struggle ensued. Appellant grasped the steering wheel, which caused the car to veer off the road, down an embankment, and into a concrete wall. The cab came to rest tilted to one side, with appellant against the passenger side door and Blackshire on top of him. Blackshire was bleeding from a head wound sustained when he struck the rear view mirror in the crash. He climbed out the driver's side door, and appellant followed him. Appellant then left the scene.

When the police arrived, Blackshire described the larger robber as "a Black male. Very heavy, six-one or six-foot to six-two, over

3

300 pounds," bald, wearing a black sweat suit.  Before the
ambulance transported Blackshire to the hospital for treatment of
his wounds, he was taken to a nearby restaurant where "two very
large Black males" had been detained.  Blackshire stated that
neither of the detained men was the one who attempted to rob him.
 At the subsequent physical lineup, Blackshire placed a question
mark by number three, appellant.  Appellant "looked a little bit
different" in the lineup, but Blackshire thought he identified the
man who robbed him.

**The Robbery of Steven Benson (Count 4).**[2]

Steven Benson, the assistant manager of the Smorgabob's
restaurant in Vallejo, was robbed while he worked the cash register
on the afternoon of December 27, 1998.  Immediately after the
robbery, Benson described the suspect for the police as "a Black
man, male, standing five-foot-eight, weighing 300 pounds," with a
"white beanie" and a Pendleton shirt.  Regina Littlefield, a
customer at the restaurant at the time of the robbery, gave
"essentially the same description" to the investigating officer.
Benson identified appellant as the robber at the lineup by marking
"number three," based upon appellant's physical stature as the
"biggest one."  He identified appellant again at trial, after looking
at "him directly in the face" and immediately recognizing him.
Benson described the robber at trial as "about six-five and 300 plus
pounds," not "necessarily Negro," but with that "racial tone,"
wearing gray sweatpants.  Littlefield testified that she thought the
robber was "really stout," "six-one, maybe 235 pounds," wearing a
plaid, blue jacket, blue jeans, and a beanie, but she did not see his
face and could not identify him.

**The Robbery of Johann Kennedy (Count 5).**

Johann Kennedy worked as a server at Mr. D's restaurant in
Vallejo on the evening of December 28, 1998.  A man she
identified at trial as appellant approached her at the cook station to
order a coffee to go.  She testified that appellant was "very tall,
heavyset," 300 pounds or more, with "dark skin, dark eyes," and
baby face.  He wore a ski jacket, a Pendleton shirt, and had "a gun
."  When Kennedy opened the cash register, appellant took the gun
from behind his jacket, pointed it at her, and demanded money.
Kennedy had no familiarity with guns, but it "looked real" to her,
and she was frightened by it.  Appellant warned Kennedy that he
"would use the gun" if she "let anybody else know what was going
on."  Kennedy gave appellant $200 from the cash register.  As he
left the restaurant, appellant told Kennedy not to move until he was
out of sight.

---

[2] Since appellant was acquitted of this charge, we recite the pertinent facts as necessary
only to the identification issue.

4

Two other witnesses gave descriptions of the apparent robber at trial, but did not identify him.  Denise Connors was a customer in Mr. D's restaurant, and from behind observed a "large gentleman" talking to Kennedy as she held a coffee cup.  The man wore a plaid blue jacket and a "black like beanie cap."  Just a couple of minutes before the robbery, Jimmy Rand, a cook at the restaurant, noticed a large "Black guy," slightly more than six feet tall, close to 300 pounds, wearing a black and white plaid jacket.

Kennedy gave a description of the robber to the police that basically matched her testimony at trial.  Two days after the robbery, Detective Harry Bennigson showed Kennedy three separate sets of six photographs of suspects who were "large Black males" that "fit the description of the robber."  The first two lineups did not contain a photograph of appellant, and Kennedy did not make an identification.  Appellant's photograph was in the third lineup, and Kennedy made a positive identification of him. The third photographic lineup was also exhibited to Rand, and he made an identification of appellant's photograph that was "not 100 percent sure."[3]

**The Robbery of Nelsena Garrett (Count 6).**

A robbery occurred at the Save Max grocery store in Vallejo at 1:00 a.m. of [sic] December 30, 1998.  Nelsena Garrett, one of the cashiers that morning, testified that a man she later identified as appellant approached her cash register to purchase a bottle of alcohol.  Before the purchase was completed, appellant told Garrett "to give him all the money in the drawer, and it was a robbery." When Garrett looked back at appellant, he assured her that he was "serious."  Appellant warned Garrett "not to scream or . . . push any buttons or anything and stuff, give him all the money in the register."  Appellant held one hand under his coat to simulate a weapon.  Garrett removed all the cash from the register and gave it to appellant, whereupon he left the store.  Garrett testified that appellant was "heavyset," around 300 pounds, five feet ten inches to five feet eleven inches, a little facial hair or "slight razor stubble," with a "scar on his face near the eye," wearing a brown plaid Pendleton jacket, and a white "brim hat" with a scarf under it.[4]

Gayosa Johnson observed appellant from her cash register at the front of the Save Max store.  She recalled that he was heavyset,

---

[3] Rand was not able to identify appellant at trial.

[4] In her description to the officer who responded to the report of the robbery, Garrett added that appellant wore dark pants, and the scar was under his left eye.

275 to 330 pounds, about six feet tall, with a "baby face," and wore a white jacket and beige khaki pants.  Johnson noticed appellant's face as he walked into the store, when he went to Garrett's register to buy alcohol, and then again as he left.  After appellant was gone, Garrett came over to Johnson's register, crying, and said: "The guy just robbed me."

Garrett and Johnson both participated in the physical lineup on January 12, 1999.  Garrett looked at all seven men in the lineup, and was "sure" that appellant, number three, was the man who robbed her.  Johnson recognized appellant from his "side profile," and marked number three.  Johnson also picked appellant's photograph from a "series of six pictures" shown to her by a defense investigator.  Garrett and Johnson viewed a surveillance tape of the robbery that depicted a heavyset man in a light-colored shirt, dark pants and a hat, but it was not distinct enough to discern the suspect's facial features.

**The Arrest of Appellant.**

Appellant was arrested by Sergeant Robert Lewis of the Vallejo Police Department on December 30, 1998, at his girlfriend's duplex in Vallejo.  On a dresser near the front door of the residence the officer found a gym bag that contained two extra large size Pendleton style shirts.  Appellant's residence on Georgia Street in Vallejo was also searched, but no incriminating evidence was discovered.  No weapons or money were found during either search.  Evidence was adduced that at the time of his arrest appellant had a distinctive scratch or scar under his left eye.  He was six feet one inch tall, weighed 330 pounds, and was 28 years old.  He was bald, and had "slight" facial hair around his mustache and chin.  After appellant was arrested, the series of grocery store robberies in Vallejo that fit the suspect description of "a large Black man with a Pendleton shirt stopped."

**The Pretrial Physical Lineup.**

After robbery victim Johann Kennedy identified a photograph of appellant, Sergeant Bennigson arranged a physical lineup on January 12, 1999.  The physical descriptions of the suspect varied from "five-eight to six-four," 250 to over 300 pounds, 21 to 40 years old, and clean shaven to slight facial hair.[5]  Bennigson therefore composed a lineup with some diversity from the inmates at the jail, but with "very large people" "similar to what the witnesses' descriptions were."  A total of seven people were placed in the lineup.  Appellant was the only person in the lineup that weighed over 300 pounds, although others were "close," in the

---

[5]  This discrepancy in the physical descriptions of the suspect was not uncommon, testified Bennigson.

"high 200's."  The heights of the fillers in the lineup ranged from five feet six inches to six feet two inches tall, and from 190 to nearly 300 pounds.  One of the fillers was six feet two inches tall and weighed between 250 and 300 pounds.  Bennigson was satisfied with the composition of the lineup, and appellant's appointed counsel gave her approval of it.

The witnesses were escorted together to the jail facility to view the lineup.  A deputy district attorney and appellant's counsel were also present.  Bennigson told the witnesses that the suspect "may or may not be here."  He read the witnesses standard instructions from a prepared card "on how they are supposed to view the lineup, how to mark the card and so forth."  All the witnesses verbally indicated that they understood the instructions and so marked their cards.   Bennigson specifically told the witnesses not to discuss "their robberies" or descriptions of the suspect, and to his knowledge "everyone was very good about it."  Each witness individually viewed the lineup.  Every witness other than Michael Blackshire promptly made a positive identification of appellant by placing an "X" at position number three.  Although Blackshire "put a question mark" by appellant's position, he indicated after the lineup that he nevertheless had "no doubt that number three was the person that robbed him."[6]

**The Defense Evidence.**

Appellant presented the expert opinion testimony of Dr. Bruce Behrman on the vagaries of eyewitness identification testimony and the fairness of the pretrial lineup.  Dr. Behrman testified that "brain processing" occurs in three stages – perception, storage, and retrieval – that results in a "constructive" process of addition and deletion rather than a just an objective "recording" of an event or information.  He also enumerated various factors that affect an identification, such as lighting, duration of exposure to the suspect, the delay between the crime and the identification, the degree of fear or stress that attends the event, the "concept of weapon focus," personal familiarity with the suspect, and a "cross-racial" identification.  According to Dr. Behrman, eyewitness memory experiments and archival work indicate that the "typical hit rate" – that is, the percentage of witnesses who "actually pick the right person" in a lineup – is between "50 to 70 percent," depending upon conditions.

The eyewitness identification accuracy rate also depends upon the fairness of the lineup.  In a fair lineup, every person "should meet

---

[6] Blackshire explained to Bennigson that there "was confusion on his part," and he had "only seen the suspect's face for a short time as he was getting into the cab," but "there was no doubt."

the general description given by the witnesses."  Dr. Behrman also explained the term "functional lineup," which he described as the "number of people in the lineup who actually at least fairly well mirror the description" given by a witness.  In a "functional lineup" of six persons, the accuracy rate of identification is approximately 66 percent.  He characterized the lineup in which appellant participated as a functional lineup of only three, rather than seven, based upon the size disparity of some of the subjects.  In Dr. Behrman's opinion, appellant's functional lineup of three exhibited to the witness between two to four weeks after the crimes presented a "solid likelihood of misidentification."  However, Dr. Behrman acknowledged that a greater number of independent identifications increases the rate of accuracy.

Chantile Lewis, appellant's sister, testified for the defense that appellant stayed at her residence at 545 Georgia Street, unit number 2, the entire night of December 15, to the morning of December 16, 1999, when the robbery at the Food 4 Less Supermarket occurred.  She further testified that appellant's size and chronic asthmatic condition prevents him from running.  Appellant is also unable to drive a car.

Defense investigator James McCully testified that he compiled a photographic lineup from drivers' licenses and California ID cards of six "people who were of similar size and similar complexion" to appellant.  McCully showed the photographic lineup to witnesses Benson, Fuller, Johnson, and Garrett.  Benson selected two photographs other than appellant; Fuller picked appellant, and was "pretty sure" of his identification; Johnson selected appellant's photograph; Garrett "indicated that she would not pick anyone out."[7]

After petitioner's conviction was affirmed by the California Court of Appeal, petitioner filed a petition for review in the California Supreme Court.  Resp.'s Lodg. Doc. J.  That petition was summarily denied.  *Id.*  Petitioner subsequently filed a petition for certiorari in the United States Supreme Court, which was denied on October 7, 2002.  *Lewis v. California*, 537 U.S. 915 (2002).

On October 27, 2000, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  Resp.'s Lodg. Doc. I.  That petition was summarily denied by order dated November 16, 2001.  *Id.*  Petitioner subsequently filed a petition for review of that decision,

_____

[7] The other witnesses either did not respond to McCully's efforts to contact them or refused to participate in his photographic lineup.

1 which was denied by order dated February 27, 2002.  Lodg. Doc. K.

2          On February 28, 2003, petitioner filed a habeas petition in the California Supreme Court.

3 Lodg. Doc. L.  That petition was denied by order dated October 22, 2003.  *Id.*  On November 5,

4 2003, petitioner filed a second petition for writ of habeas corpus in the California Supreme

5 Court.  Lodg. Doc. M.  That petition was summarily denied on August 25, 2004.  *Id.*

6          On February 24, 2005, petitioner commenced this action by filing his federal habeas

7 petition in this court.

8 **II.     Analysis**

9          **A.  Standards for a Writ of Habeas Corpus**

10          Federal habeas corpus relief is not available for any claim decided on the merits in state

11 court proceedings unless the state court's adjudication of the claim:

12                    (1) resulted in a decision that was contrary to, or involved an
                     unreasonable application of, clearly established Federal law, as
13                    determined by the Supreme Court of the United States; or

14                    (2) resulted in a decision that was based on an unreasonable
                     determination of the facts in light of the evidence presented in the
15                    State court proceeding.

16 28 U.S.C. § 2254(d).

17          Under section 2254(d)(1), a state court decision is "contrary to" clearly established

18 United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

19 set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

20 indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

21 result.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

22 (2000)).

23          Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas

24 court may grant the writ if the state court identifies the correct governing legal principle from the

25 Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

26 case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

9

1   that court concludes in its independent judgment that the relevant state-court decision applied

2   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

3   unreasonable."  *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not

4   enough that a federal habeas court, in its independent review of the legal question, is left with a

5   'firm conviction' that the state court was 'erroneous.'")

6         The court looks to the last reasoned state court decision as the basis for the state court

7   judgment.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a

8   decision on the merits but provides no reasoning to support its conclusion, a federal

9   habeas court independently reviews the record to determine whether habeas corpus relief is

10   available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

11   **B.  Petitioner's Claims**

12         **1.  <u>Ineffective Assistance of Counsel</u>**

13         Petitioner raises two claims of ineffective assistance of trial counsel.  After setting forth

14   the applicable legal principles, the court will analyze these claims in turn below.

15             **a.  <u>Legal Standards</u>**

16         To support a claim of ineffective assistance of counsel, a petitioner must first show that,

17   considering all the circumstances, counsel's performance fell below an objective standard of

18   reasonableness.  *See Strickland*, 466 U.S. at  687-88.  After a petitioner identifies the acts or

19   omissions that are alleged not to have been the result of reasonable professional judgment, the

20   court must determine whether, in light of all the circumstances, the identified acts or omissions

21   were outside the wide range of professionally competent assistance.  *Id*. at 690; *Wiggins v.*

22   *Smith*, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by

23   counsel's deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice is found where

24   "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

25   proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a probability

26   sufficient to undermine confidence in the outcome."  *Id.*

An attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel. *Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)). *See also Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance"). "To show prejudice under *Strickland* resulting from the failure to file a motion, a defendant must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Kimmelman*, 477 U.S. at 373-74) (so stating with respect to failure to file a motion to suppress on Fourth Amendment grounds). *See also Van Tran v. Lindsey*, 212 F.3d 1143, 1156-57 (9th Cir. 2000) (no prejudice suffered as a result of counsel's failure to pursue a motion to suppress the lineup identification), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003); *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (trial counsel is not ineffective in failing to file a suppression motion "which would have been 'meritless on the facts and the law'"); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (failure to file suppression motion not ineffective assistance where counsel investigated filing the motion and there was no reasonable possibility that the evidence would have been suppressed); *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991) (counsel did not render ineffective assistance by failing to file a motion to suppress that was "clearly lacking in merit").

### b. Failure to File Motion to Suppress Evidence

As described by the California Court of Appeal, petitioner was arrested at the duplex of his girlfriend, Angela Davis, where police found a gym bag containing two extra large size "Pendleton style" shirts. Petitioner claims his trial counsel rendered ineffective assistance in failing to move to suppress evidence regarding discovery of the shirts. He argues that "the entry [into his girlfriend's apartment] was non-consensual and without probable cause." Pet. at 8. He also points out that Ms. Davis filed a complaint for damages against the City of Vallejo

1  stemming from this incident, in which she claimed that the police entered her apartment without

2  her permission.

3         Respondent counters that petitioner has failed to demonstrate a motion to suppress would

4  have been successful because: (1) he has provided no evidence that Ms. Davis failed to consent

5  to the search; (2) he has provided no evidence the officers did not have a search or arrest

6  warrant; (3) the evidence shows the shirts were in plain view; and (4) the search "could have

7  lawfully been executed incident to petitioner's arrest."  Memorandum of Points and Authorities

8  in Support of Answer (hereafter "P&A") at 17-18.  Respondent notes that, although Ms. Davis

9  filed a damages claim against the city, it "was not sworn" and "lacked any detail or elaboration."

10 *Id.* at 17; Resp.'s Ex. L at Ex. A, consecutive p. 21.  Respondent also notes that petitioner has not

11 included a declaration from himself or from Ms. Davis regarding the search of Davis' home.

12 P&A at 17.  Finally, respondent argues that even if trial counsel had filed a successful motion to

13 suppress, a different outcome at trial was not reasonably probable given the other evidence

14 against petitioner, including the fact that numerous victims identified him as the robber.  *Id.* at

15 18-19.  Respondent argues, "the shirts were incriminating but not pivotal in light of the abundant

16 other evidence against petitioner."  *Id.* at 19.

17        Petitioner's traverse contains an exhibit that appears to be a police report describing the

18 search for petitioner, culminating in his arrest at his girlfriend's duplex.  Traverse, Ex. A.  The

19 report indicates that police "requested entry" into the duplex and that, while Davis was "hesitant

20 at first," she "then responded and opened the front door."  *Id.* at 3.  When Davis was asked

21 whether petitioner was in the residence, she "nodded her head yes."  *Id.* at 4.  The officer stated

22 that he "noted men's clothing . . . on top of two separate dressers," and that he photographed the

23 clothing and took two shirts.  *Id.*  Petitioner was arrested and transported to the police station.

24 *Id.*

25        Petitioner argues that the fact the officers "requested entry" into the duplex indicates they

26 did not have a search warrant.  Traverse at 3.  He "still does not concede to police having

permission to enter Ms. Davis residence." *Id.*  Petitioner notes that the damages claim filed by Ms. Davis states that police entered her duplex "without warrant, and took clothes without permission."  *See* Resp.'s Ex. L at Ex. A, consecutive p. 21.  He also notes that the damages claim form contains a warning that presentation of a false claim with intent to defraud is a felony.  *Id.*; Traverse at 3.  Petitioner argues this warning is "the equivalent of swearing under the penalty of perjury."  Traverse at 3.  Petitioner provides copies of photographs introduced into evidence at his trial, which, according to him, show that the bag containing the shirts was closed in the first photograph but open in the second and third photographs.  Traverse, Exs. B, C.  He argues this provides evidence the shirts were not originally in plain view but were tampered with by the police to imply that they were.[8]

Petitioner denies that the result at trial would have been the same if the Pendleton shirts had been suppressed.  He contends the other evidence against him was unpersuasive.  He argues that the eyewitness identification was based on "grossly prejudicial suggestive lineups."  Traverse at 4.  He notes that one of the victims, Mr. Bensen, testified he believed the lineup was overly suggestive.  *Id.*; Reporter's Transcript on Appeal ("RT") at 321.  Petitioner also argues that there was no physical or DNA evidence connecting him to the robberies.  Traverse at 5.  Petitioner contends "the entire trial was about identification," and argues that the evidence "left elements of doubt."  *Id.*

After a review of the record, this court concludes that petitioner has failed to show a motion to suppress would have been meritorious.  First, the evidence before the court reflects that the police had lawful justification for entering Davis' duplex and that they entered with her consent.  Specifically, the documents provided to this court reflect that police detectives had

---

[8]  The photographs depict several duffle bags on top of two dressers.  Traverse, second set of photographs attached to Ex. C.  Some plaid items appear in or on two of the duffle bags.  One of the bags is closed in one of the photographs, but is unzipped in the other photograph.  These photographs are insufficient to demonstrate that the police tampered with evidence found in Davis' apartment in order to give the false impression that Pendleton shirts were in plain view.

reason to believe that petitioner, a suspect in numerous robberies, was present in Ms. Davis'

duplex and that she consented, albeit reluctantly, to their entry into her home.  Her damages

claim form does not contradict this version of the events.  The form states that the police entered

the duplex "without warrant," but says nothing about whether she consented to their entry.

Resp.'s Ex. L at Ex. A, at consecutive p. 21.

In addition, the trial evidence reflects that the shirts were in plain view in Ms. Davis'

apartment.  The plain-view doctrine is an exception to the general rule that warrantless searches

are presumptively unreasonable.  *Horton v. California*, 496 U.S. 128, 133 (1990).  Under the

plain-view doctrine, if officers are lawfully in a position from which they view an object, if its

incriminating character is immediately apparent, and if the officers have a lawful right of access

to the object, they may seize it without a warrant.  *Id.* at 136-37.[9]  The arresting officer testified

at petitioner's trial that one of the Pendleton shirts was inside the gym bag on a dresser near the

front door and one of them was on the top of the bag.  RT at 289, 291.  He also testified that "the

gym bag was open at the time," and "you could see in it pretty clearly."  RT at 289, 291.  The

photographs submitted by petitioner do not refute this officer's testimony that at least one of the

shirts was in plain view on top of a gym bag, nor do they establish that the officers had to move

or manipulate anything in order to view the shirts.  *Cf. Arizona v. Hicks*, 480 U.S. 321 (1987)

(officer's actions in moving equipment to locate serial numbers constituted "search," which had

to be supported by probable cause, notwithstanding that officer was lawfully present in

apartment where equipment was located).  Further, the incriminating nature of the shirts was

apparent.  Numerous witnesses had described the perpetrator as wearing a Pendleton style shirt.

This gave the officers reasonable grounds to suspect that the shirts were incriminating in nature.

////

---

[9]  The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by an officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no search within the context of the Fourth Amendment.  *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993).

1    In short, it appears that the police were justified in seizing the Pendleton shirts, which were in

2    plain view in Davis' apartment.  Under these circumstances, petitioner has failed to demonstrate

3    a reasonable probability that, had his counsel filed a motion to suppress the shirts found at the

4    scene of petitioner's arrest, the trial court would have found it meritorious.

5         Petitioner has also failed to show that, had the motion been granted, it is reasonable there

6    would have been an outcome at trial more favorable to him.  Numerous witnesses identified

7    petitioner as the person who robbed them, both at trial and during pretrial identifications

8    procedures.  For the reasons explained below, this court concludes that the pretrial photographic

9    lineup, at which he was identified by a number of victims, passes constitutional muster.  In light

10   of this evidence, petitioner has failed to show prejudice resulting from trial counsel's failure to

11   file a motion to suppress the fact that several Pendleton shirts, which are worn by many people,

12   were found at the apartment of Ms. Davis.  Accordingly, for all of these reasons, petitioner is not

13   entitled to relief on this claim of ineffective assistance of counsel.

14                       c.  **Failure to File Motion for New Trial**

15        Petitioner also claims that his trial counsel rendered ineffective assistance in failing to

16   move for a new trial based on newly discovered DNA evidence that the blood found on the

17   airbags in Mr. Blackshire's taxi came from Mr. Blackshire and not from petitioner.  Pet. at

18   penultimate page.  Petitioner argues that these test results "offered powerful corroboration of

19   misidentification."  *Id.*  Petitioner raised this claim in his habeas petition filed in the California

20   Court of Appeal.  Resp.'s Lodg. Doc. I at "Page-21."  In support of the claim, petitioner included

21   a declaration signed by his trial counsel.  *Id.*, Ex. B.

22        Trial counsel declares that prior to trial, he and petitioner met to discuss petitioner's case,

23   including the charges related to the attempted robbery of Mr. Blackshire.  *Id.* at 2.  Petitioner told

24   his counsel not to conduct DNA testing on the blood found in Mr. Blackshire's cab.  *Id.* at 2-3.

25   Petitioner and counsel agreed that, unless petitioner changed his mind, the blood would not be

26   tested.  *Id.* at 3.  The prosecutor, however, conducted a DNA test on the blood found in the taxi.

                                          15

*Id.* at 4.  During jury deliberations, the prosecutor gave petitioner's trial counsel a copy of the test results.  *Id.*  Counsel telephoned the criminalist who authored the report and was informed the blood on the airbags belonged to Mr. Blackshire.  *Id.*  Counsel did not consider bringing a motion for new trial based on this DNA evidence and petitioner did not ask him to do so.  *Id.* at 5.  Counsel declares that he "might have considered the late DNA blood evidence report as a basis for a motion for new trial or some other challenge to the judgment on count three if the report had tended to identify a specific person other than [petitioner] as the would-be robber of Mr. Blackshire."  *Id.*

Trial counsel's declaration provides evidence that counsel made a tactical decision not to file a motion for new trial on the basis of the DNA evidence because he did not believe it had a chance of success.  This decision was not unreasonable.  The test results did not tend to exclude petitioner as the perpetrator; in fact, the results had no bearing on whether petitioner was the perpetrator.  They merely demonstrated that Mr. Blackshire had suffered a wound which caused him to bleed on the airbags.  Any speculation that further testing may have turned up the DNA of a person other than petitioner or Mr. Blackshire is insufficient to establish deficient performance.  Petitioner's tactical decision does not constitute deficient performance under the facts of this case.  *See Strickland*, 466 U.S. at 690 (reasonable tactical decisions are "virtually unchallengeable").  Accordingly, petitioner is not entitled to relief on this claim.

## 2. Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support the firearm use enhancement alleged in Count V, the robbery at Mr. D's restaurant.  Pet. at 8.  The California Court of Appeal rejected this argument, reasoning as follows:

### Sufficiency of the Evidence

### II. The Evidence in Support of the Firearm Use Enhancement.

The remaining arguments presented on appeal relate to the 10 year firearm use enhancement (§ 12022.53) associated with count 5.  Appellant asserts that the enhancement finding is not supported by

16

sufficient evidence of use of a "firearm."  He claims the victim's testimony failed to adequately prove that the "handgun" she referred to was a "true 'firearm.'"

We review the record in accordance with the familiar substantial evidence rule.  "'Whether the defendant . . . personally used a firearm [is a] factual question[ ] for the jury's determination.  (*People v. Smith* (1980) 101 Cal.App.3d 964, 967 [161 Cal.Rptr. 787].)  [¶]  On appeal, " . . . the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255] .)  The court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citations.]  If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding."  [Citation.]'  (*People v. Jacobs* (1987) 193 Cal.App.3d 375, 379-380 [238 Cal.Rptr. 278].)"  (*People v. Dominguez* (1995) 38 Cal.App.4th 410, 421; *see also People v. Alvarez* (1996) 14 Cal.4th 155, 225.)

Section 12022.53 mandates imposition of a 10 year sentence enhancement where the defendant "personally used a firearm" during the commission of certain enumerated offenses, one of them robbery.  The firearm use enhancement in the present case required the jury to find that appellant (1) personally used (2) a firearm (3) in the commission or attempted commission of a robbery.  (*See People v. Runnion* (1994) 30 Cal.App.4th 852, 855.)  "The gun use enhancement is applicable to all uses of a weapon, from the most 'benign' display to the most heinous confrontation."  (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1301.)  "Whether the gun was loaded or operable is irrelevant."  (*People v. Johnson* (1995) 38 Cal.App.4th 1315, 1321.)  "'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies.  "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." . . . ' [Citation.]"  (*People v. Camacho* (1993) 19 Cal.App.4th 1737, 1747.)

The firearm use enhancement statutes seek "'to deter both physical harm and conduct which produces fear of harm.  The fear may arise either from a gun that really shoots or from one which is designed to shoot and gives the appearance of shooting capability.' [Citation.]"  (*People v. Jackson* (1979) 92 Cal.App.3d 899, 902 .)  Thus, "'it is enough that the prosecution produce evidence of a gun designed to shoot and which gives the appearance of shooting

17

capability.' [Citation.]" (*Ibid.*)  "[W]hen a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use" of a firearm. (*People v. Granado* (1996) 49 Cal.App.4th 317, 325; *see also People v. Funtanilla* (1991) 1 Cal.App.4th 326, 330-331.)

Appellant challenges only the element that he "used a 'firearm' in the Count V robbery."  For purposes of section 12022.53, "'firearm' means any device, designed to be used as a weapon, from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion."  (§ 12001, subd. (b).) A "'handgun' fits within the legal definition of 'firearm.'"  (*People v. Runnion, supra,* 30 Cal.App.4th at p. 857, fn. 3.)  Appellant maintains that the jury was not presented with any "physical evidence of a projectile-firing handgun at all," and the victim's testimony did not establish that the weapon was real "rather than a toy."

According to Johann Kennedy's testimony, after she opened the cash register appellant pointed a gun at her, which she identified as a "handgun."  Appellant asked for "all the money" in the cash register, and directed Kennedy to "stay still."  He warned Kennedy that he "would use the gun" if she "let anybody else know what was going on."  On cross-examination, Kennedy acknowledged that she had little familiarity with firearms.  When asked if the gun "could have been real" or a "toy," Kennedy responded: "It's hard to tell, but it looked real."  Kennedy testified that she was extremely frightened by the weapon appellant displayed.

We conclude that Kennedy's testimony supports the finding of appellant's use of a "firearm" within the meaning of sections 12001 and 12022.53.  Kennedy testified that appellant displayed what looked like a real gun, and used it in a threatening manner as if it were real.  The victim's lack of expertise with firearms does not negate her testimony that the weapon appellant pointed at her appeared to be an authentic handgun.  Nor does her testimony that while the gun "looked real," it was "hard to tell" from a toy, establish lack of substantial evidence to support the finding.  To the contrary, on appeal "'any conflict or contradiction in the evidence, or any inconsistency in the testimony of witnesses must be resolved by the trier of fact who is the sole judge of the credibility of the witnesses.  It is well settled in California that one witness, if believed by the jury, is sufficient to sustain a verdict. To warrant the rejection by a reviewing court of statements given by a witness who has been believed by the trial court or the jury, there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear.'  (*See also People v. Breault* (1990) 223

1   Cal.App.3d 125, 140-141 [273 Cal.Rptr. 110]; *In re Paul C.* (1990)
2   221 Cal.App.3d 43, 54 [270 Cal.Rptr. 369].)  It also is true that
    uncertainties or discrepancies in witnesses' testimony raise only
3   evidentiary issues that are for the jury to resolve.  (*People v.
    Glaude* (1983) 141 Cal.App.3d 633, 641 [190 Cal.Rptr. 479].)"
4   (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1258-1259 .)
    Kennedy's testimony, which was accepted by the trier of fact, was
5   consistent with appellant's use of a firearm.  Further, appellant's
    threat to shoot the victim, coupled with his brandishing of the
6   weapon in a manner that suggested it was real, furnished an
    inference that it was a firearm.  (*See People v. Rodriguez* (1999) 20
7   Cal.4th 1, 12 13; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533,
    541-542.)  The evidence of appellant's display of a weapon which
8   gave every appearance of having the capability of use as a
    handgun, his threat to shoot the victim if she failed to cooperate,
9   and the justifiable fear it engendered, supports the count 5
    enhancement finding for use of a firearm in the commission of a
10   robbery pursuant to section 12022.53.  (*See People v. Jackson,
    supra*, 92 Cal.App.3d at pp. 902-903; *People v. Colligan* (1979) 91
    Cal.App.3d 846, 851.)

11

12   Opinion at 12-15.

13         There is sufficient evidence to support a conviction if, "after viewing the evidence in the

14   light most favorable to the prosecution, any rational trier of fact could have found the essential

15   elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

16   (1979).  "[T]he dispositive question under *Jackson* is 'whether the record evidence could

17   reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d

18   978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).  A petitioner in a federal habeas

19   corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used

20   to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262,

21   1274, 1275 & n.13 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the

22   decision of the state court reflected an objectively unreasonable application of *Jackson* and

23   *Winship* to the facts of the case.  *Id.*

24         The court must review the entire record when the sufficiency of the evidence is

25   challenged in habeas proceedings. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

26   *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987).  The

court has done so here.  However, it is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. *Turner v. Calderon*, 281 F.3d 851, 881-82 (9th Cir. 2002).  The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).  The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

Viewing the evidence in the light most favorable to the verdict, and for the reasons expressed by the state appellate court, there was sufficient evidence introduced at petitioner's trial to support the jury finding that petitioner used a firearm when he robbed Mr. D's restaurant. As explained by the state court, the testimony of Ms. Kennedy that she thought petitioner's weapon was a real gun, coupled with petitioner's threat to use it if she didn't cooperate, constituted sufficient evidence for a rational jury to conclude that petitioner used a firearm in the commission of this offense.  As noted by respondent, there is no evidence in the record that the gun used by petitioner in the robbery of Mr. D's restaurant was not real.  The conclusion of the state court that sufficient evidence supported the firearm use enhancement is not contrary or an unreasonable application of United States Supreme Court authority.  Accordingly, petitioner is not entitled to relief on this claim.

### 3. Fourth Amendment

Petitioner claims that he was subjected to unreasonable search and seizure, in violation of the Fourth Amendment, because "the overnight bag was zipped shut when first observed by arresting officers; there was no search warrant or probable cause to enter Ms. Davis home no permission was given." Pet. at 8.  Respondent argues that this claim is not cognizable in this federal habeas proceeding and has not been exhausted in any event.  Even assuming *arguendo*

that this claim has not been exhausted in state court, this court recommends that the claim be denied on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

The United States Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). There is no evidence before the court that petitioner did not have a full and fair opportunity to litigate any Fourth Amendment claim he wished to present in state court. Accordingly, this claim is barred in this federal habeas proceeding. *Stone*, 428 U.S. at 494.

**4.  Impermissibly Suggestive Lineup**

Petitioner claims that the pretrial lineup procedure utilized in this case was "so unnecessary suggestive and conducive to irreparable misidentification as to deny petitioner due process of law under both state and federal constitution." Pet. at penultimate page. He asserts that none of the "fillers" in the lineup were as heavy as he is and that some of them were significantly shorter. Traverse at 16-17. He contends that none of the fillers matched the exact descriptions given by the victims. *Id.* He notes that one of the victims told a police officer the lineup was suggestive. *Id.* at 17. Petitioner also argues that the victims' identifications were not reliable under the totality of the circumstances. Traverse at 18. He notes that some of the victims stated the robber was clean shaven or had only minimal facial hair, whereas he had a mustache and goatee at the time of the crimes. *Id.*

////
////
////
////

21

### a. **State Court Opinion**

The California Court of Appeal rejected these claims, reasoning as follows:

### I. The Fairness of the Pretrial Lineup.

Appellant argues that the pretrial physical lineup was impermissibly suggestive and therefore violated his due process rights.  He particularly complains that the size disparity of the subjects in the lineup, with only two fillers who "came near resembling him in stature and girth," caused him to be "singularly marked for identification" by the witnesses.  He further argues that the identification testimony of the witnesses was tainted by the suggestive lineup and must be suppressed.

Determining whether the identification violates due process has two components.  First, we must determine whether the pretrial identification procedure was unduly suggestive.  (*Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107; *People v. Gordon* (1990) 50 Cal.3d 1223, 1242; *People v. Nguyen* (1994) 23 Cal.App.4th 32, 37-38.)  Impermissible unfairness exists in a pretrial identification procedure "if it suggests in advance of a witness's identification the identity of the person suspected by the police."  (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052; *see also People v. Pervoe* (1984) 161 Cal.App.3d 342, 358.)  "A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive that it creates a very substantial likelihood of irreparable misidentification.  The defendant bears the burden of proving unfairness as a 'demonstrable reality,' not just speculation."  (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819; *see also People v. DeSantis* (1992) 2 Cal.4th 1198, 1222; *People v. Brandon, supra*, at p. 1051.)  Each case turns on its own facts.  (*People v. Contreras, supra*, at p. 823.)  "'[I]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]"  (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.)

Second, "[a]ssuming the procedure is unduly suggestive and unnecessary, the court must next decide whether the in-court identification was nevertheless reliable under the totality of the circumstances.  In so doing, the court examines, 'the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation . . . [citation].' [Citations.]"  (*People v. Nguyen, supra*, 23 Cal.App.4th at p. 38; *see also People v. Ochoa, supra*, 19 Cal.4th at p. 412.)  "'"If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.  [Citation.]"'  [Citation.]"  (*People v. Phan* (1993) 14 Cal.App.4th 1453, 1461; *see also People v. DeSantis, supra*, 2 Cal.4th at p. 1222.)

"On review we must consider the totality of the circumstances to determine whether the identification procedure was unconstitutionally suggestive.  We must resolve all evidentiary conflicts in favor of the trial court's findings and uphold them if supported by substantial evidence."  (*People v. Contreras, supra*, 17 Cal.App.4th at p. 819.)

We have examined the photographs of the lineup and conclude, as did the trial court, that it was not unfair.  Some discrepancy in the size of the lineup participants was reasonable given the various descriptions given by the witnesses, which ranged from five feet eight inches, to six feet four inches, and from 250 to 330 pounds. Appellant was not the tallest person in the lineup, and while he was the heaviest, all of the fillers appear to be of the same stocky physique as appellant.  Appellant does not appear to be distinctly larger in build than at least a few others in the lineup, particularly those standing in proximity to him.

"[T]here is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance."  (*People v. Brandon, supra*, 32 Cal.App.4th at p. 1052; *see also People v. Blair* (1979) 25 Cal.3d 640, 661.) "Because human beings do not look exactly alike, differences are inevitable.  The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him."  (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.)  Size disparity in a lineup is not per se suggestive.  (*See People v. Floyd* (1970) 1 Cal.3d 694, 712; *People v. Lyons* (1970) 4 Cal.App.3d 662, 667; *People v. Elder* (1969) 274 Cal.App .2d 381, 390-391; *People v. Farley* (1968) 267 Cal.App.2d 214, 218; *People v. Tarpley* (1968) 267 Cal.App.2d 852, 854-855.)  "Instead, the crucial issue is whether appellant has been singled out and his identification made a foregone conclusion under the circumstances. . . ."  (*People v. Faulkner* (1972) 28 Cal.App.3d 384, 391; *see also People v. Vallez* (1978) 80 Cal.App.3d 46, 55.) Appellant may have been the largest person in the lineup, but the difference in size between him and some of the other participants was not so great as to indicate suggestiveness.  (*See People v. Burke* (1980) 102 Cal.App.3d 932, 941.)  Other subjects in the lineup, as well as appellant, fit within the various height descriptions of the robber given by the witnesses.  Appellant was surrounded by others in the lineup who were at least of similar stature; we do not think his size singled him out among the lineup participants.  (*See People v. Phan, supra*, 14 Cal.App.4th at p. 1462.)

Size was necessarily a factor in the identification of appellant.  He is a distinctively large man, so the witnesses naturally and inevitably mentioned size in their descriptions of the robber. However, the evidence shows the witnesses also based their identifications on appellant's facial features and other physical

23

characteristics, not size alone.  For instance, Gayosa Johnson testified that she selected appellant in the lineup the moment she looked at his face in profile.  Other witnesses mentioned appellant's large, round "baby face," or his eyes, as factors in their identifications.  Richard Fuller expressly denied that he selected the "biggest man in the lineup," but rather "picked out the man that robbed" him.  And, upon our review of the lineup, we find that many of the participants have features essentially similar to appellant.

Nor does the fact that some of the witnesses viewed either a surveillance tape of the crime or a prior photographic lineup taint the physical lineup.  The surveillance tape was not of sufficient clarity to distinguish the robber, and the photographs exhibited to Johann Kennedy and Jimmy Rand were "DMV photos" of faces only.  Further, appellant makes no claim that the photographic lineup was itself impermissibly suggestive.  We discern nothing in the record to indicate that the surveillance tape or the photographic lineup adversely influenced the subsequent physical lineup.

We also find nothing in the lineup *procedure* that demonstrates unfairness.  The witnesses were told not to discuss the case or their identifications, and apparently followed the admonition.  The presentation of the lineup to the witnesses was entirely neutral, and approved by defense counsel after it was slightly reconfigured and a seventh person was added at her request.  The identifications were not based on any suggestive elements, but rather the witnesses' observations.  The only unique characteristic of appellant when compared to the other participants – his weight – did not create an unconstitutionally suggestive lineup where the subjects were sufficiently similar in size and other attributes.  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217; *People v. DeSantis, supra*, 2 Cal.4th at p. 1222; *People v. Holt* (1972) 28 Cal.App.3d 343, 350.)  Upon review of the totality of circumstances, we conclude that the lineup was not impermissibly suggestive.  (*People v. Carpenter, supra*, 15 Cal.4th at p. 367.)

Opinion at 9-12.

### b. **Applicable Law**

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules propounded by Supreme Court).  A suggestive identification violates due process if it was

unnecessary or "gratuitous" under the circumstances. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). *See also United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step process in determining the constitutionality of pretrial identification procedures: first, whether the procedures used were impermissibly suggestive and, if so, whether the identification was nonetheless reliable). Each case must be considered on its own facts and whether due process has been violated depends on "'the totality of the circumstances' surrounding the confrontation." *Simmons v. United States*, 390 U.S. 377, 383 (1968). *See also Stovall*, 388 U.S. at 302. An identification procedure is suggestive where it "[i]n effect . . . sa[ys] to the witness 'This is the man.'" *Foster v. California*, 394 U.S. 440, 443 (1969). If the flaws in the pretrial identification procedures are not so suggestive as to violate due process, "the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." *Id.* at 443 n.2. *See also Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature"); *United States v. Kessler*, 692 F.2d 584, 586-87 (9th Cir. 1982) (unless the procedure used is so suggestive that it raises a "very substantial likelihood of irreparable misidentification," doubts go to the weight, not the admissibility, of the evidence) (internal quotation and citation omitted).

On the other hand, if an out-of-court identification is inadmissible due to unconstitutionality, an in-court identification is also inadmissible unless the government establishes that it is reliable by introducing "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *United States v. Wade*, 388 U.S. 218, 240 (1967). *See also United States v. Hamilton*, 469 F.2d 880, 883 (9th Cir. 1972) (in-court identification admissible, notwithstanding inherent suggestiveness, where it was obviously reliable). In making this determination, the court examines "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the level of

1    certainty demonstrated at the confrontation, and (5) the length of time between the crime and the

2    confrontation." *Manson*, 432 U.S. at 114 (citing *Biggers*, 409 U.S. at 199-200).  Additional

3    factors to be considered in making this determination are "the prior opportunity to observe the

4    alleged criminal act, the existence of any discrepancy between any pre-lineup description and the

5    defendant's actual description, any identification prior to lineup of another person, the

6    identification by picture of the defendant prior to the lineup, failure to identify the defendant on a

7    prior occasion, and the lapse of time between the alleged act and the lineup identification."

8    *Wade*, 388 U.S. at 241.  The "central question," is "whether under the 'totality of the

9    circumstances' the identification is reliable even though the confrontation procedure was

10   suggestive." *Biggers*, 409 U.S. at 199.

**c.  Was The Identification Procedure Suggestive?**

12           This court has reviewed a photograph of the live lineup and concludes, as did the state

13   courts, that it is not impermissibly suggestive.[10]  The lineup consists of seven persons.  *See* Dckt.

14   No. 42.  At least three other participants, including the participants standing next to petitioner,

15   appear to be very close to him in size.  Several other participants are shorter or thinner,

16   corresponding to some of the victims' estimates of the size and appearance of the robber.

17   Because the victims had differing descriptions of the size of the perpetrator, as to both height and

18   weight, the differences in size among the participants in the lineup is not unnecessary or

19   "gratuitous."  In addition, the facial features of many of the participants are similar to

20   petitioner's facial features.  The lineup does not suggest the identity of the perpetrator and, more

21

22           [10]  On October 4, 2010, at this court's request, respondent lodged a color photocopy of
     "Defendant's Trial Exhibit A," which consists of a photograph of the live lineup in which
23   petitioner was a participant.  Dckt. No. 42.  Respondent represents that the prosecutor's
     photographic exhibits of the lineup have been destroyed.  *Id.*  On October 21, 2010, petitioner
24   filed a "request for judicial notice," in which he requests that the court consider various attached
     documents and photographs in connection with his claim regarding the photographic lineup.
25   This court has reviewed and considered the documents contained in petitioner's request, but
     concludes that they do not demonstrate the lineup procedure conducted in this case was
26   impermissibly suggestive.

specifically, does not suggest that petitioner is the perpetrator.

Further, as explained by the California Court of Appeal, the lineup procedure itself was not impermissibly suggestive.  Defense counsel ultimately approved the procedure, there is no evidence the witnesses acted improperly or discussed their choice with any other witness, no-one suggested to any witness the identity of the perpetrator or even that the perpetrator was in the lineup, and there is no other evidence of unfairness.  All of the witnesses identified petitioner quickly.  RT at 32-34.  After conducting a hearing on petitioner's motion to suppress the pretrial and in-court identifications, which included the testimony of witnesses for the defense and the prosecution, the trial court concluded that the lineup was not so "grossly unfair that would cause . . . a substantial likelihood of irreparable misidentification."  *Id.* at 122-23.  This court agrees.  Accordingly, the court cannot conclude that the identification procedure employed in this case resulted in a "very substantial likelihood of irreparable misidentification."  *Kessler*, 692 F.2d at 586-87.

### d.  Was the In-Court Identification Reliable?

Even assuming that the identification procedure used here was suggestive, the undersigned concludes that the in-court identifications were nonetheless reliable because they were not especially likely to yield an "irreparable misidentification."  *Manson*, 432 U.S. at 116 (internal quotation and citation omitted).

Audra Harvey had ample opportunity to observe the robber.  RT at 135.  She looked straight at him after he stated "this was a robbery."  *Id.* at 136, 143.  Petitioner was approximately two feet away at the time.  *Id.* at 137.  She talked to him for a "minute or so" while looking "right into his face."  *Id.*  Ms. Harvey identified petitioner in the courtroom without hesitation.  *Id.* at 138.  She apparently described petitioner to the responding police officers as a black man, approximately five feet eleven inches tall and weighing about 250 pounds.  *Id.* at 135-36, 143.

////

1   Mr. Fuller was in the taxi conversing with the robber for about fourteen minutes.  *Id.* at

2   205.  Although it was dark outside, he was able to clearly see the man on two occasions when he

3   got out of taxi and walked in front of it to get to a store, and when the overhead light came on

4   after he got back in the taxi.  *Id.* at 205-07.  His headlights "illuminated the gentleman."  *Id.* at

5   205.  He identified the robber to the police as a black man, approximately six feet four inches tall

6   and weighing over 300 pounds, wearing a Pendelton shirt.  *Id.* at 213.  Mr. Fuller himself was six

7   feet tall and weighed 300 pounds.  *Id.* at 204.  He stated that the robber was clean shaven.  *Id.* at

8   216-17.[11]  Mr. Fuller identified petitioner in the courtroom without hesitation.  *Id.* at 203.

9   Mr. Blackshire described the "big" person who entered his cab as "six foot, something

10  like that" and "300 plus" pounds.  *Id.* at 219.  He made eye contact with the man as he got in the

11  car.  *Id.* at 238-39.  He also talked to the robber for about a minute and a half while they were

12  face-to-face in the car after it rolled down the embankment and came to rest on its side.  *Id.* at

13  226-27.  He stated that the man had "hair on his face."  *Id.* at 240.  After the police picked Mr.

14  Blackshire up from the scene of the accident, they brought him to a restaurant, where he was

15  shown two large black males who had been detained.  *Id.* at 233.  Blackshire informed the police

16  that these were not the people who had robbed him.  He identified petitioner in the courtroom as

17  the man who had robbed him.  *Id.* at 233.  He did not have "any doubt in [his] mind."  *Id.*

18  Petitioner was acquitted of the robbery of Smorgabob's restaurant in Vallejo.  Steven

19  Benson testified at petitioner's trial that he did not get a good look at the person who robbed him

20  because he was mainly concerned with whether the robber was armed.  *Id.* at 315, 318-19.

21  Johann Kennedy testified that the person who robbed her at Mr. D's restaurant in Vallejo

22  was "very tall, heavyset . . .dark skin, dark eyes, a jacket, a gun."  *Id.* at 161.  He was three feet

23  away from her, "on the other side of the counter of the cash register."  *Id.* at 162.  The man asked

24

25  [11]  As described by the California Court of Appeal, when petitioner was arrested he had
    some facial hair around his mustache and chin.  Petitioner has also submitted photographs
26  depicting himself with facial hair.  Traverse, Ex. C.

her for a cup of coffee, she gave it to him, and he paid. *Id.* He then went outside, drank the coffee, and ran off. *Id.* While he was outside he stared at her to make sure she didn't move. *Id.* at 176. The man did not take the gun out until after she opened the cash register. *Id.* at 163. Prior to this time, she was looking at his face. *Id.* at 164. She looked at him face-to-face while he was talking. *Id.* at 163. Mr. Kennedy stated the man was about six-four or so and "at least 270, 300 pounds." *Id.* The restaurant was well lit during her encounter with the robber. *Id.* at 163-64. She spent two or three minutes with him. *Id.* at 164. About two weeks later, a detective came to the restaurant and showed her some photographs. *Id.* at 166-67. She identified petitioner as the robber. *Id.* at 167. On cross-examination, she testified the robber did not have a mustache or a beard. *Id.* at 170-71. At trial, Ms. Kennedy identified petitioner as the robber without hesitation. *Id.* at 169. As noted by the California Court of Appeal, Ms. Kennedy was shown three separate sets of photographs of suspects. The first two lineups did not contain a photograph of petitioner and Kennedy did not make an identification from those lineups. Petitioner's photograph was in the third lineup, and Kennedy made a positive identification of him from that lineup.

Nelsena Garrett testified that the person who robbed her appeared to her to be five feet ten or eleven inches tall and approximately 300 pounds. *Id.* at 261. When he told her "it was a robbery," she looked back at him. *Id.* at 262. He told her not to scream and to give him all the money in the register. *Id.* Ms. Garrett was three or four feet from the robber. *Id.* at 262-63. She was looking at him in the face while speaking to him. *Id.* at 263. It was bright in the store and she had no problem seeing his face. *Id.* at 264. Without apparent hesitation, Ms. Garrett identified petitioner in the courtroom as the person who robbed her. *Id.* at 268-69.[12]

---

[12] Ms. Garrett was apparently unwilling to view a photographic lineup shown to her at her place of employment by defense counsel prior to trial, but picked petitioner out of the same lineup at trial. RT at 271-72, 281. Petitioner challenges Garrett's in-court identification, arguing that "no one can be for sure if she picked petitioner out of the photo line up because he was also physically sitting right in front of her." Traverse at 12. This court rejects that argument.

1    The victims' descriptions of the robber were reasonably accurate and independently

2  consistent.  All of them had ample opportunity to view the robber at close range for several

3  minutes, and described him as tall and very heavy.  They all agreed that petitioner was the

4  person who had robbed them.  They all identified petitioner at trial without apparent hesitation.

5  It was clear from the testimony of these victims that their in-court identification of petitioner was

6  based on their memory of the robber at the time of the crimes and not on the out-of-court

7  identifications.  Because the identification procedure was not unduly suggestive and, in any

8  event, the in-court identifications of petitioner by the witnesses were not unreliable, petitioner is

9  not entitled to relief on his challenges to the victims' identification of him as the perpetrator of

10  the robberies.

11                **5.  Cruel and Unusual Punishment**

12    Petitioner claims that his sentence of 150 years to life in state prison for "five second

13  degree robber[ies]" constitutes cruel and unusual punishment because "it's so disproportionate to

14  the crime."  Pet. at penultimate page.  He argues that his sentence "can only be characterized as a

15  death sentence."  *Id.*

16    The United States Supreme Court has held that the Eighth Amendment includes a

17  "narrow proportionality principle" that applies to terms of imprisonment.  *See Harmelin v.*

18  *Michigan*, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring).  *See also Taylor v. Lewis*, 460

19  F.3d 1093, 1097 (9th Cir. 2006).  However, successful challenges in federal court to the

20  proportionality of particular sentences are "exceedingly rare."  *Solem v. Helm*, 463 U.S. 277,

21  289-90 (1983).  *See also Ramirez v. Castro*, 365 F.3d 755, 775 (9th Cir. 2004).  "The Eighth

22  Amendment does not require strict proportionality between crime and sentence.  Rather, it

23  forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Harmelin*, 501

24  _____

25  Petitioner has failed to demonstrate that Ms. Garrett's identification of him at trial was unreliable
   or that "the photographic identification procedure was so impermissibly suggestive as to give
26  rise to a very substantial likelihood of irreparable misidentification."  *Simmons*, 390 U.S. at 384.

U.S. at 1001 (Kennedy, J., concurring) (citing *Solem v. Helm*).  In *Lockyer v. Andrade*, the
United States Supreme Court found that in addressing an Eighth Amendment challenge to a
prison sentence, the "only relevant clearly established law amenable to [AEDPA's] 'contrary to'
or 'unreasonable application of' framework is the gross disproportionality principle, the precise
contours of which are unclear and applicable only in the 'exceedingly rare' and 'extreme' case."
538 U.S. at 73 (*citing Harmelin*, 501 U.S. 957; *Solem*, 463 U.S. 277; and *Rummel v. Estelle*, 445
U.S. 263, 272 (1980)).  In that case, the Supreme Court held that it was not an unreasonable
application of clearly established federal law for the California Court of Appeal to affirm a
"Three Strikes" sentence of two consecutive 25 year-to-life imprisonment terms for a petty theft
with a prior conviction involving theft of $150.00 worth of videotapes.  *Andrade*, 538 U.S. at
75; *see also Ewing v. California*, 538 U.S. 11, 29 (2003) (holding that a "Three Strikes" sentence
of 25 years-to-life in prison imposed on a grand theft conviction involving the theft of
three golf clubs from a pro shop was not grossly disproportionate and did not violate the Eighth
Amendment).

　　　　In assessing the compliance of a non-capital sentence with the proportionality principle, a
reviewing court must consider "objective factors" to the extent possible.  *Solem*, 463 U.S. at 290.
Foremost among these factors are the severity of the penalty imposed and the gravity of the
offense.  "Comparisons among offenses can be made in light of, among other things, the harm
caused or threatened to the victim or society, the culpability of the offender, and the absolute
magnitude of the crime."  *Taylor*, 460 F.3d at 1098.[13]

----

[13]  As noted in *Taylor*, the United States Supreme Court has also suggested that reviewing
courts compare the sentences imposed on other criminals in the same jurisdiction, and also
compare the sentences imposed for commission of the same crime in other jurisdictions.  460
F.3d at 1098 n.7.  However,

> consideration of comparative factors may be unnecessary; the *Solem* Court "did
> not announce a rigid three-part test."  *See Harmelin*, 501 U.S. at 1004, 111 S.Ct.
> 2680 (Kennedy, J., concurring). Rather, "intrajurisdictional and interjurisdictional
> analyses are appropriate only in the rare case in which a threshold comparison of

1    The court finds that in this case petitioner's sentence does not fall within the type of

2  "exceedingly rare" circumstance that would support a finding that his sentence violates the

3  Eighth Amendment.  Petitioner's sentence is certainly a significant penalty.  However, petitioner

4  committed four robberies and an attempted robbery with the use of a handgun, and he was found

5  to have sustained two prior felony convictions for robbery and to have served a prior state prison

6  term.  Clerk's Transcript on Appeal at 14, 171.  In *Harmelin*, the petitioner received a sentence

7  of life without the possibility of parole for possessing 672 grams of cocaine.  In light of the

8  *Harmelin* decision, as well as the decisions in *Andrade* and *Ewing*, which imposed sentences of

9  twenty-five years to life for petty theft convictions, the sentence imposed on petitioner is not

10  grossly disproportionate.  Because petitioner does not raise an inference of gross

11  disproportionality, this court need not compare petitioner's sentence to the sentences of other

12  defendants in other jurisdictions.  This is not a case where "a threshold comparison of the crime

13  committed and the sentence imposed leads to an inference of gross disproportionality."  *Solem*,

14  463 U.S. at 1004-05.  The state courts' rejection of petitioner's Eighth Amendment claim was

15  not an unreasonable application of the Supreme Court's proportionality standard.  Accordingly,

16  this claim for relief should be denied.

17  ////

18  ////

19  ////

20  ////

21  ////

22

23  the crime committed and the sentence imposed leads to an inference of gross
disproportionality."  *Id.* at 1004-05, 111 S.Ct. 2680; see also *Rummel v. Estelle*,
445 U.S. 263, 282, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) ("Absent a

24  constitutionally imposed uniformity inimical to traditional notions of federalism,
some State will always bear the distinction of treating particular offenders more

25  severely than any other State.").

26  *Id.*

32

**III.  Conclusion**

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  March 31, 2011.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE